UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the ICC Arbitration Between<br><br>SL MINING LIMITED<br>26 Main Motor Road<br>Brookfields<br>Freetown<br>Sierra Leone<br><br>                     Petitioner,<br><br>           v.<br><br>THE GOVERNMENT OF THE REPUBLIC<br>OF SIERRA LEONE<br>Guma Building<br>Lamina Sankoh Street<br>Freetown<br>Sierra Leone<br><br>                     Respondent. | Civil Action No. 1:19-cv-2888 |

**PETITION TO CONFIRM ARBITRAL AWARD**

Petitioner SL Mining Limited ("**SL Mining**" or "**Petitioner**"), by and through its undersigned counsel, hereby petition this Court for an order pursuant to 9 U.S.C. § 207 (i) confirming and recognizing the September 8, 2019 Order ("**Emergency Final Order**") issued by Emergency Arbitrator Professor Zachary Douglas QC in connection with emergency proceedings related to an arbitration between Petitioner and Respondent the Government of the Republic of Sierra Leone ("**Sierra Leone**") pursuant to the Rules of Arbitration of the International Chamber

of Commerce ("**ICC Rules**" or "**ICC**");[1] (ii) ordering Sierra Leone to comply with the Emergency Final Order's directives, including the directive obligating Sierra Leone to "lift the prohibition on shipping introduced in the 'Temporary Suspension Order of Mineral Rights – ML 01/2017' issued by the Minister of Mines and Mineral Resources," issued on July 3, 2019 and reaffirmed on July 24, 2019; (iii) entering judgment in Petitioner's favor against Sierra Leone in an amount equal to the monetary award set forth in the Emergency Final Order, plus the costs of this proceeding; and (iv) awarding Petitioner such other and further relief as this Court deems just and proper.

**I.    PARTIES, JURISDICTION AND VENUE**

1. Petitioner brings this summary proceeding under the United Nations Convention for the Recognition and Enforcement of Foreign Arbitral Awards (June 10, 1958), 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "**New York Convention**") and Chapter 2 of the Federal Arbitration Act ("**FAA**"), 9 U.S.C. §§ 201 *et seq.*, to confirm a duly-rendered Emergency Final Order issued in its favor against Sierra Leone.

2. Petitioner is a private limited liability company incorporated under the laws of Sierra Leone. Petitioner is wholly owned by its ultimate parent company Gerald International Limited. Gerald International Limited is the parent company of the international commodity trading group (the founding company of which was established in Stamford, Connecticut in 1962) with a majority of U.S. private shareholders. Gerald International Limited also has several operational subsidiaries operating in the United States.

3. Respondent is the Government of Sierra Leone and is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("**FSIA**"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-611.

---

[1]  A true and correct copy of the Emergency Final Order is attached as **Exhibit A** to the Declaration of Ema Vidak Gojkovic, dated September 24, 2019 ("**Gojkovic Dec.**").

4. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1330(a), as Sierra Leone is not entitled to sovereign immunity in connection with the cause of action set forth herein. Specifically, Sierra Leone is not immune by virtue of 28 U.S.C. § 1605(a)(6), which provides that a foreign state does not enjoy sovereign immunity in any case brought to confirm arbitration awards that "are or may be governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards." The Emergency Final Order is governed by the New York Convention as it was issued in connection with an ICC arbitration seated in the United Kingdom (a signatory to the New York Convention) that arises out of a legal, commercial relationship between Petitioner and Sierra Leone, and pursuant to "an agreement in writing" within the meaning of Article II(2) of the New York Convention. 9 U.S.C. § 202; New York Convention, Art. II(2).

5. Subject matter jurisdiction is also conferred pursuant to 9 U.S.C. § 203.

6. Personal jurisdiction over Sierra Leone is expressly conferred by 28 U.S.C. § 1330(b), which provides that this Court may exercise personal jurisdiction over a foreign state in any action with respect to which the foreign state is not entitled to sovereign immunity under 28 U.S.C. §§ 1605-1607, and where service of process is effectuated in accordance with 28 U.S.C. § 1608(a).

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

## II. RELEVANT BACKGROUND

### A. Summary of the Dispute

8. The dispute between Petitioner and Sierra Leone arises out of Sierra Leone's breach of a Large Scale License Agreement ("**MLA**"), which granted Petitioner certain rights to mine iron ore in Port Loko District, Sierra Leone (the "**Marampa Project**").

9. On March 29, 2017, Sierra Leone awarded Petitioner a Large-Scale Mining License No. ML 01/2017 (the "**License**") for a term of 25 years, and on December 5, 2017 concluded with Petitioner the MLA, which entitles Petitioner to explore for and mine iron ore in the Marampa area. Vidak Gojkovic Dec., Ex. A, ¶ 60 ("**Gojkovic Dec.**"). Petitioner and Sierra Leone subsequently negotiated and concluded the MLA. The MLA was ratified by the Parliament of Sierra Leone on December 6, 2017. *Id.*, Ex. A, ¶ 61.

10. The MLA entitles Petitioner to, among other things, explore and mine iron ore in the Marampa area and export the mined iron ore. In return, Sierra Leone is entitled to a royalty of 3% market value of the mined ore, while Petitioner is obliged to pay between 0.5% and 1% of its revenue over a particular year to community development programs. *Id..*, Ex. A, ¶ 62.

11. As Petitioner exercised its rights under the MLA, Sierra Leone underwent a change of government in April 2018, with the new government led by President Julius Maada Bio. Shortly after assuming office, President Bio issued Executive Order No. 1, which suspended all duties and tax waivers for all companies in Sierra Leone. *Id.*, Ex. A, ¶ 70.

12. Sierra Leone continued to interfere with Petitioner's activities under the MLA. On July 3, 2019, Petitioner received a letter from the Minister of Mines and Mineral Resources ("**Minister of Mines**") prohibiting all mining, processing, hauling, and shipping activities under the License for a period of 21 days. *Id.*, Ex. A, ¶ 72. This letter alleged, among other claims, that Petitioner had contravened the Mines and Minerals Act of 2009 ("**MMA**"), that Petitioner made a statement to Sierra Leone in connection with its mining activities which it knew or ought to have known to be false, and that the Attorney General and Minister of Justice of Sierra Leone had commenced an alleged criminal investigation into Petitioner. *Id.*, Ex. A, ¶ 72.

13. Later communications with the Sierra Leone made clear the true purpose of its actions against Petitioner. During a meeting with Petitioner, the Minister of Mines conceded that the reasons for the July 8, 2019 temporary suspension were purely pretextual, as the real purpose was to pressure Petitioner into renegotiating the MLA. Gojkovic Dec., Ex. A, ¶¶ 75-79.

14. On July 29, 2019, Petitioner received another letter dated July 24, 2019 from the Minister of Mines. This letter, while lifting the License suspension, purported to indefinitely suspend Petitioner's right to ship mined ore out of Sierra Leone. *Id.*, Ex. A, ¶ 79.

15. On August 13, 2019, the Minister of Mines wrote to Petitioner again, attempting to impose unreasonable "terms and conditions" in violation of the MLA in order to allow Petitioner to resume shipping, including payment of a US $1,000,000 performance bond, advance payment of royalties to Respondent, and that Petitioner "agree in principle" to "revisit/renegotiate some of the clauses in the MLA". *Id.*, Ex. A, ¶ 81. Renegotiation of the MLA was put forward as a necessary condition before Respondent would consider lifting the shipping/export ban. *Id.*, Ex. A, ¶ 82.

16. In addition to Sierra Leone's refusal to abide by the MLA, the Government's shipping suspension is presently causing Petitioner serious and ongoing financial harm. While Sierra Leone has lifted the mining suspension, the ongoing shipping/export suspension is threatening the viability of the project since Petitioner cannot export any of the ore it mines under the MLA. *Id*., Ex. A, ¶¶ 92–6.

17. As the Emergency Arbitrator found, Petitioner's inability to store its mined ore will require Petitioner to halt all lawful mining and haulage operations. *Id*, Ex. A, ¶ 97. Indeed, since the Emergency Final Order was issued, Petitioner has ceased all mining activity at the Marampa

Mine, and the mine was placed into "care and maintenance" on September 13, 2019. Gojkovic Dec., ¶ 8.

18. Given the fact that the Marampa Mine employs a large number of the local population, and similarly provides much needed support in the area, shutting down the Marampa Mine will cause severe harm not just to Petitioner, but the local community as well. *Id.*, Ex. A, ¶ 95. As the Emergency Arbitrator noted in his decision, these grave consequences have not been disputed by Sierra Leone. *Id.*, Ex. A, ¶ 96.

19. In light of this, Petitioner initiated the Emergency Proceedings, seeking, primarily, a lifting of the shipping/export ban in order to ensure that Petitioner was not irreparably prejudiced by Sierra Leone's actions before a resolution of the underlying arbitration claims.

**B.     The Arbitration**

20. Under Clause 6.9(c) of the MLA, Sierra Leone and Petitioner agreed to arbitrate "all differences of opinion or disputes which may arise between them in respect to the execution performance and interpretation or termination of this Agreement, and in respect of the rights and obligations of the parties deriving therefrom" under the ICC Rules.

21. Clause 6.9 of the MLA provides as follows:

> (a) Except as may be otherwise herein expressly provided, this Agreement shall be construed, and the rights of [the Government of Sierra Leone] and SL MINING hereunder shall be determined, according to the Laws of Sierra Leone.
>
> (b) The parties shall in good faith endeavour to reach an amicable settlement of all differences of opinion or disputes which may arise between them in respect to the execution performance and interpretation or termination of this Agreement, and in respect of the rights and obligations of the parties deriving therefrom.
>
> (c) In the event that the parties shall be unable to reach an amicable settlement within a period of 3 (three) months from a written notice by one party to the other specifying the nature of the dispute and seeking an amicable settlement, either party may submit the matter

>to the exclusive jurisdiction of a Board of 3 (three) Arbitrators who shall be appointed and carry out their mission in accordance with the International Rules of Conciliation and Arbitration of the International Chamber of Commerce (ICC). The venue of the arbitration shall be London, England. The English language shall be used in the proceedings. The award and any decision of the Arbitration Board shall be final and binding and enforceable in and by the courts of Sierra Leone upon either party having the same force and effect as a judgment of a court of the last resort of the Republic of Sierra Leone or any other appropriate jurisdiction.

*Id.*, Ex. A, ¶ 101.

22. On August 20, 2019, Petitioner filed an application for emergency measures ("**Application**") in accordance with Article 29 and Appendix V of the ICC Rules, of which the Secretary General of the ICC International Court of Arbitration acknowledged receipt on August 21, 2019. On August 22, 2019, the Secretariat of the ICC International Court of Arbitration informed Petitioner and Sierra Leone that Professor Zachary Douglas QC of Matrix Chambers had been appointed Emergency Arbitrator to preside over Petitioner's Application. *Id.*, Ex. A, ¶ 12.

23. On August 27, 2019, a telephonic conference took place between Petitioner, Respondent, and the Emergency Arbitrator. During the telephonic conference Petitioner applied for an interim order ("**Interim Order**"), which the Emergency Arbitrator granted on August 30, 2019. In the Interim Order, the Emergency Arbitrator ordered Respondent to "lift the production on shipping introduced in the 'Temporary Suspension Order of Mineral Rights – ML 01/2017' issued by the Minister of Mines on 3 July 2019 and reaffirmed on 24 July 2019" in order to permit Petitioner to make several shipments of iron ore concentrate. *Id.*, Ex. A, ¶ 29. The Interim Order further required that Sierra Leone "confirm by an official communication . . . that the prohibition on shipping has been lifted for the five shipments". Sierra Leone failed to comply with the Interim Order. *Id.*, Ex. A, ¶ 29.

24. Also, on August 30, 2019, Petitioner filed a Request for Arbitration ("**RFA**"), as required by Article 1(6) of Appendix V of the ICC Rules requiring submission of a Request for Arbitration within 10 days of receipt of an application for emergency arbitrator proceedings. Gojkovic Dec., Ex. A, ¶ 24.

25. On September 6, 2019, a telephonic hearing regarding Petitioner's Application took place. *Id.*, Ex. A, ¶ 47.

26. On September 9, 2019, the Emergency Arbitrator issued the Emergency Final Order. The Emergency Final Order found that there was a risk of irreparable harm if emergency relief was not granted, and thus ordered the following:

- That Sierra Leone lift the prohibition on shipping as introduced in the "Temporary Suspension Order of Mineral Rights – ML 01/2017" issued by the Minister of Mines on July 3, 2019 and reaffirmed on July 24, 2019;
- That Petitioner pay US $33,000 for each shipment made after the Emergency Final Order into an escrow account administered by the ICC;
- That Sierra Leone pay the Emergency Arbitrator's fees and the ICC's fees and expenses in the total amount of US $40,000;
- That Sierra Leone pay Petitioner's legal costs and expenses incurred in relation to the emergency arbitrator proceedings in the total amount of US $253,556.90.

*Id.*, Ex. A, ¶¶ 120–27.

27. The Emergency Final Order noted that the lifting of the shipping/export ban would not prejudice Sierra Leone, and that, by establishing an escrow account in which Petitioner would be required to submit US $33,000 per shipment, would protect any royalties to which Sierra Leone

8

may be entitled to at the conclusion of proceedings without further harming Petitioner. *Id.*, Ex. A, ¶ 108.

28. The Emergency Final Order further notes that there is a "serious question" as to whether Sierra Leone acted lawfully, as there is "substantial evidence on the record" suggesting that Sierra Leone's suspension order first issued in July 2019 "was to put pressure on SL Mining to renegotiate the commercial aspects of the Agreement." *Id.*, Ex. A, ¶ 91.

29. The Emergency Final Order also noted that it replaced the Interim Order previously issued on August 30, 2019, and further declared the Emergency Final Order "enforceable immediately[.]" *Id.*, Ex. A, ¶ 127.

30. To date, Sierra Leone has not complied with its obligations under the Emergency Final Order to lift the shipping/export ban or to pay Petitioner's costs and fees in making the application for emergency relief.

31. Sierra Leone has not replied to Petitioner's requests that it satisfy its obligations under the Emergency Final Order. For example, on September 11, 2019, Petitioner sent a letter to Sierra Leone requesting that it satisfy the Emergency Final Order. Sierra Leone has neither acknowledged receipt of that letter nor satisfied its obligations under the Emergency Final Order. Gojkovic Dec., ¶¶ 5, 7.

32. Moreover, on September 20, 2019, Petitioner again wrote to Sierra Leone regarding its non-compliance with the Emergency Final Order, and informed Sierra Leone of its intention to enforce the Emergency Final Order. Sierra Leone has similarly neither acknowledged receipt of this letter nor complied with the Emergency Final Order. *Id.*, ¶¶ 6, 7.

33. As a result of Sierra Leone's refusal to comply with the Emergency Final Order, this Petition seeks confirmation of the Emergency Final Order by this Court.

### III. REQUEST FOR RELIEF

34. Petitioner repeat and reallege the allegations in paragraphs 1 through 33 as if set forth fully herein.

35. The arbitration agreement set forth herein at paragraphs 20 through 21 constitutes "an agreement in writing" within the meaning of Article II(2) of the New York Convention.

36. The Emergency Final Order arose out of a legal relationship that is commercial within the meaning of 9 U.S.C. § 202.

37. The Emergency Final Order was made in the United Kingdom, a nation that is a signatory to the New York Convention, and which is a State other than the State where recognition and enforcement is sought hereby.

38. The Emergency Final Order is final and binding within the meaning of the New York Convention and Chapter 2 of the FAA.

39. None of the grounds for refusal or deferral of the Emergency Final Order set forth in the New York Convention apply.

40. The Emergency Final Order is required to be confirmed pursuant to the New York Convention and 9 U.S.C. § 207.

WHEREFORE, Petitioner prays:

(a) That the Court enter an order pursuant to 9 U.S.C. § 207 recognizing and entering judgment on the Emergency Final Order against Sierra Leone; and

(b) That, on the basis of the confirmed Emergency Final Order, the Court enter a judgment that Sierra Leone is liable to Petitioner in the amount of US $293,556.90;

(c) That on the basis of the confirmed Emergency Final Order, the Court direct Sierra Leone to lift the shipping/export ban directed at Petitioner; and

(d) That Petitioner be awarded such other and further relief as may be proper.

Dated: New York, New York
September 25, 2019

        Respectfully submitted,

        */s/ James E. Berger*
        James E. Berger (D.C. Bar 481408)
        Charlene C. Sun (D.C. Bar 1027854)

        KING & SPALDING LLP
        1185 Avenue of the Americas
        New York, NY 10036-4003
        Tel: (212) 556-2200
        Fax: (212) 556 -2222
        jberger@kslaw.com
        csun@kslaw.com

        *Attorneys for Petitioner*