# EXHIBIT A

**IN THE MATTER OF AN EMERGENCY**          Case No. 24708/TO (EA)

**APPLICATION UNDER THE RULES OF ARBITRATION**

**OF THE INTERNATIONAL CHAMBER OF COMMERCE**

**BETWEEN:**

**SL MINING LIMITED**
**(Sierra Leone)**

**Applicant**

**vs**

**THE GOVERNMENT OF SIERRA LEONE**

**Respondent**

**ORDER**

**8 September 2019**

**EMERGENCY ARBITRATOR**

**Professor Zachary Douglas Q.C.**

# TABLE OF CONTENTS

**Page**

**A**   **INTRODUCTION**   **2**

**A1**   THE APPLICANT   **2**
**A2**   THE RESPONDENT   **3**
**A3**   THE EMERGENCY ARBITRATOR   **4**
**A4**   PROCEDURAL LAW AND RELEVANT ICC RULES   **4**
**A5**   PROCEDURAL HISTORY   **5**

**B**   **GOVERNING LAW AND ARBITRATION CLAUSE**   **15**

**C**   **REQUESTS FOR RELIEF**   **15**

**D**   **JURISDICTION AND ADMISSIBILITY**   **16**

**E**   **THE BACKGROUND TO THE AGREEMENT**   **18**

**F**   **THE REQUIREMENTS FOR THE GRANT OF EMERGENCY MEASURES**   **19**

**F1**   INTRODUCTION   **19**
**F2**   IS THERE A SERIOUS QUESTION TO BE TRIED?   **20**
**F3**   IS SL MINING EXPOSED TO IRREPARABLE HARM?   **27**
**F4**   WHERE DOES THE BALANCE OF CONVENIENCE LIE?   **30**
**F5**   CONCLUSIONS ON THE EMERGENCY MEASURES TO BE ADOPTED   **33**

**G**   **COSTS**   **34**

**H**   **ORDER**   **36**

## A    INTRODUCTION

1.    This Emergency Application from SL Mining Limited (the **Application**) concerns a dispute arising from the Large Scale Licence Agreement between the Government of Sierra Leone and SL Mining Limited dated 5 December 2017 (the **Agreement**).[1]  This is the Emergency Arbitrator's Order.

## A1    The Applicant

2.    The Applicant is SL Mining Limited (hereinafter referred to as **SL Mining** or the **Applicant**) with the following address:

> 26 Main Motor Road
> Brookfields
> Freetown
> Sierra Leone

3.    The Applicant is represented in these proceedings by John Savage QC and Ema Vidak Goijkovic of King & Spalding International LLP and Kenneth R. Fleurier and Charles B. Rosenberg of King & Spalding LLP.  Their addresses are as follows:

### King & Spalding International LLP

125 Old Broad Street
London EC2R 1AR
United Kingdom

E-mail:        jsavage@kslaw.com
               evidakgojkovic@kslaw.com

Tel :    +44 20 7551 7500
Fax :    +44 20 7551 7575

### King & Spalding LLP

1700 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
United States of America

E-mail:        kfleuriet@kslaw.com
               crosenberg@kslaw.com

Tel:      +1 202 626 8970

---

[1]        Exhibit C-3.

Fax:    +1 202 626 3737

**A2    The Respondent**

4.    The Respondent is the Government of Sierra Leone (hereinafter referred to as the ***Government*** or the ***Respondent***).   According to the preamble of the Agreement, the Government is represented for the purposes of that contract by the Minister of Mines and Mineral Resources:

Hon. Foday Rado Yokie
**Minister of Mines and Mineral Resources**
Youyi Building
Brookfields
Freetown
Sierra Leone

E-mail:        radoyokie@gmail.com

5.    By correspondence dated 27 August 2019, the Office of the Attorney-General and Ministry of Justice confirmed that the following state officials are representing the Government in these proceedings:

Mohamed Lamin Tarawalley (Solicitor-General)
Osman I. Kanu (Lead Counsel)
Mohamed P. Bangura
Lahai M. Farmah

**Office of the Attorney-General and Ministry of Justice**
Guma Building
Lamina Sankoh Street
Freetown
Sierra Leone

E-mail:        lamintarawalley@yahoo.co.uk
Tel:             +23276607918

E-mail:        ozzykanu@yahoo.co.uk
Tel:             +23276666089

E-mail:        palobangs@yahoo.co.uk
Tel:             +23278156290

E-mail:        lahaimomohfarmah@gmail.com
Tel:             +23276649647

6.    Also by the same correpondence of 27 August 2019, the Government confirmed that it would be represented by the following external counsel:

> Yada Hashim William
> Osman Jalloh
> **Yada Williams & Associate**
> 7 Walpole Street
> Freetown 232
> Sierra Leone
>
> E-mail: Yadahw@yahoo.com
> Tel:      +23276611587
>
> E-mail:      jallohman@gmail.com;
>                    Osman.jalloh@yadawilliams.com;
>                    Jallohman@yahoo.com
>
> Tel:      +23278433326

7.    The Applicant and the Respondent are referred to collectively as the **Parties**.

**A3     The Emergency Arbitrator**

8.    The Emergency Arbitrator in these proceedings is:

> Professor Zachary Douglas QC
> Matrix Chambers
> 15 Rue du General Dufour
> 1204 Geneva
> Switzerland
>
> E-mail: zacharydouglas@matrixlaw.co.uk
> Tel: +41 22 310 6873

**A4     Procedural Law and Relevant ICC Rules**

9.    In Article 6.9(c) of the Agreement, the Parties have agreed that London, England shall be the venue of the arbitration. As a result of this choice of the seat of the arbitration, the English Arbitration Act 1996 applies to these proceedings.

10.   The rules governing this Emergency Application are the Rules of Arbitration of the International Chamber of Commerce, in force as from 1 March 2017, including Appendix V: Emergency Arbitrator Rules (the **ICC Rules**).

**A5**   **Procedural History**

11.    All times provided in this procedural history are given in London time.  All the references to the "Transcript" in this Order are to the transcript of the hearing on 6 September 2019 unless otherwise specified.

12.    On 20 August 2019, SL Mining filed an Application for Emergency Measures.  The Secretary General of the ICC International Court of Arbitration (***Secretary General***) acknowledged receipt on 21 August 2019 and assigned the reference 24708/TO (EA) to the Emergency Arbitrator Proceedings.  The Secretariat of the ICC International Court of Arbitration (***Secretariat***) informed the Government of the Application for Emergency Measures on 22 August 2019.  Also on 22 August 2019, the Secretariat informed the Parties that Professor Zachary Douglas QC of Matrix Chambers had been appointed as the Emergency Arbitrator by the President of the ICC Court of Arbitration.  The file was transmitted to the Emergency Arbitrator on the same day.  The deadline for the Emergency Arbitrator's order was fixed as 6 September 2019.

13.    On 22 August 2019 (22:33), the Emergency Arbitrator wrote to the Parties to invite their proposals on the format and schedule of any further written and/oral submissions and evidence before 6pm London time on 23 August 2019.

14.    On 22 August 2019 (22:36), SL Mining requested an initial case management telephone conference.  On 23 August 2019 (16:43), SL Mining communicated its proposal for the procedural schedule for the Application.

15.    On 23 August 2019 (21:05), the Emergency Arbitrator noted that the Respondent had not, to date, communicated its proposal for the procedural schedule.  The Emergency Arbitrator indicated that a case management conference call would be held on 26 August 2019 and invited the Parties to liaise as to a time that would be mutually convenient for the same.

16.    On 25 August 2019 (15:00), the Government communicated its proposal for the procedural schedule.  On 25 August 2019 (22:15), the Emergency Arbitrator requested that the Government provide contact details for all its authorized representatives in these proceedings and resolved to fix the case management conference call a day later than originally scheduled (27 August 2019).  He invited the Parties to confirm their availability for 27 August 2019 by 3pm London time on 26 August 2019.

17.   On 26 August 2019 (00:14), SL Mining communicated its objections to the procedural schedule proposed by the Government and requested that the case management conference be held at 8pm CET on 26 August 2019.   On 26 August 2019 (10:18), the Emergency Arbitrator affirmed that the case management conference would be held on 27 August 2019.

18.   On 26 August 2019 (14:49), SL Mining confirmed its availability for the case management conference on 27 August 2019.

19.   On 26 August 2019 (14:57), the Government copied the Emergency Arbitrator in its reply to SL Mining's query in respect of its availability for a case management telephone conference on 27 August 2019.   The Government stated that it could not respond until the Emergency Arbitrator replied to its proposed schedule.

20.   On 26 August 2019 (15:03), the Emergency Arbitrator noted that the Government had not provided an indication of its availability for the case management conference by the stipulated deadline of 3pm London time on 26 August 2019 and invited the Government to do so no later than 5pm London time on 26 August 2019.   On 26 August 2019 (17:44), the Emergency Arbitrator noted that no response had been received by the Government and fixed the time for the case management conference at 4.30pm London time on 27 August 2019.   On 26 August 2019 (18:25), SL Mining circulated the dial-in details for the case management conference to the Government and the Emergency Arbitrator as per the latter's earlier request.

21.   On 26 August 2019 (23:15), the Government represented that it could only obtain access to the Application the same afternoon.   It provided details of its representatives in these proceedings as per the Emergency Arbitrator's previous request and requested that the conference call be held 48 hours from the time of writing.

22.   On 27 August 2019 (7:35), the Emergency Arbitrator reaffirmed that the case management conference would be held at 4.30pm London time on 27 August 2019 in so far as Article 5(1) of Appendix V of the ICC Rules requires the establishment of the procedural timetable normally within two days and thus it was overdue.   The Emergency Arbitrator also emphasized that the only issues that will be discussed are procedural issues and hence the Government would not be expected to make submissions on the substance of the Application.

23. On 27 August 2019 (16:30), the case management telephone conference took place. The conference was attended by the following persons:

> **Emergency Arbitrator**
> Professor Zachary Douglas QC
>
> **Applicant**
> John Savage QC, King & Spalding LLP
> Ema Vidak Goijkovic, King & Spalding International LLP
> Kenneth R. Fleurier, King & Spalding LLP
> Charles B. Rosenberg, King & Spalding LLP
> Alex Strong, SL Mining
>
> **Respondent**
>
> Osman Jalloh, Yada Williams & Associate
>
> Mohamed Lamin Tarawalley (Solicitor-General)
> Osman I. Kanu (Lead Counsel)
> Mohamed P. Bangura
> Alan Palmer
> <u>Office of the Attorney-General and Ministry of Justice</u>

24. During the conference call, the Government stated that it opposed SL Mining's request for an extension to the deadline to file its Request for Arbitration. SL Mining ultimately elected to withdraw its request for an extension and undertook to file its Request for Arbitration on 30 August 2019 as envisaged under the ICC Rules. Following the conference call, the Emergency Arbitrator confirmed the procedural timetable that had been agreed by the Parties by letter of 27 August 2019 (17:54).

25. During the conference call, SL Mining applied for an interim order given what it stated to be a critical situation concerning the stockpiling of iron ore at the Marampa Mine that could not be exported due to the Government's temporary suspension order. Also during the conference call, the Emergency Arbitrator requested, and the Government agreed, that it would take instructions on whether the Government was prepared to accede to SL Mining's request for the organisation of a limited number of shipments to alleviate the immediate problem of stockpiling. The Government undertook to revert by email during the course of 28 August 2019 as soon as possible. The Emergency Arbitrator also requested, and the Parties agreed, that a further conference call would be scheduled for 10am (London time) on 29 August 2019 to discuss this issue further.

26. SL Mining reiterated its request for an interim order by email on 28 August 2019 (00:53). SL Mining formulated a specific request:

> 1. to allow SL Mining to immediately make one shipment of 60,000 WMT of iron ore concentrate in order to reduce the stockpile at the river port to its capacity of 120,000 WMT; and
>
> 2. to allow SL Mining to make four shipments of 50,000 WMT of iron ore concentrate each in order to reduce the stockpile at the production plant to below its capacity of 200,000 WMT.

27. The Emergency Arbitrator, by email on 28 August 2019 (7:55), invited the Government's counsel to take instructions on that specific request and reiterated the timing for the next conference call.

28. Two further conference calls were held between the Parties and the Emergency Arbitrator in respect of the requested interim order on 29 August 2019 (10:00 and 18:00) and two conference calls were also held on 30 August 2019 (12:00 and 15:30) with the same attendees as set out above.

29. The Emergency Arbitrator rendered an Interim Order on 30 August 2019 (16:52). The dispositive section of the Interim Order read as follows:

> 61. For the reasons set out above, the Emergency Arbitrator, having heard from the Parties, hereby issues the following Interim Order:
>
> 61.1. The Government of Sierra Leone shall lift the prohibition on shipping introduced in the "Temporary Suspension Order of Mineral Rights – ML 01/2017" issued by the Minister of Mines and Mineral Resources on 3 July 2019 and reaffirmed on 24 July 2019 to allow SL Mining to make the following shipments:
>
> 61.1.1 one shipment of 60,000 WMT of iron ore concentrate in order to reduce the stockpile at the river port to its capacity of 120,000 WMT; and
>
> 61.1.2 four shipments of 50,000 WMT of iron ore concentrate each in order to reduce the stockpile at the production plant to below its capacity of 200,000 WMT.
>
> 61.2. SL Mining will pay the amount of USD 33,000 for each of the above shipments into an escrow account opened and administered by the Secretariat of the ICC in Paris.
>
> 61.3. The Emergency Arbitrator will exercise authority over the administration of the funds held in the escrow account until such time as an arbitral tribunal is constituted under Article 6.9 of the Agreement. Authority of the administration of the funds will be transferred to the

arbitral tribunal upon the Emergency Arbitrator's receipt of a written request from the arbitral tribunal after its constitution.

61.4. The escrow arrangements stipulated in this Interim Order will terminate either (i) when the arbitral tribunal constituted under Article 6.9 of the Agreement has finally disposed of the Parties' claims and counterclaims and the funds held in the escrow account have been distributed in accordance with the directions of the arbitral tribunal or (ii) by mutual agreement of the Parties or (iii) otherwise by order of the Emergency Arbitrator or the arbitral tribunal constituted under Article 6.9.

62. The following steps shall be taken by the Parties to implement this Interim Order:

62.1. The Government of Sierra Leone shall confirm by an official communication to SL Mining and the Emergency Arbitrator that the prohibition on shipping has been lifted for the five shipments stipulated in paragraph 61.1 of this Interim Order within one hour of the issuance of this Interim Order.

62.2. Upon receipt of the Government's official communication referred to above, the Emergency Arbitrator will request the Secretariat of the ICC to open an escrow account. The details of that account will be transmitted to the Parties as soon as possible by the Emergency Arbitrator.

62.3. SL Mining shall pay USD 33,000 into the escrow account upon SL Mining's receipt of a nomination of a vessel by the buyer under the FOB contract entered into by SL Mining for each of the five shipments stipulated stipulated in paragraph 61.1 of this Interim Order;

62.4. In discharging its obligation in the preceding paragraph, SL Mining will provide a copy of the document recording the nomination of the vessel and proof of the transfer of funds to the escrow account to the Government of Sierra Leone and the Emergency Arbitrator within 24 hours of SL Mining's receipt of the nomination.

63. Both Parties have liberty to apply for a variation of this Interim Order but it shall remain in full force and effect pending any variation that may be made in writing by the Emergency Arbitrator in exercising his full discretion.

30.   On 30 August 2019 (18:22), SL Mining inquired as to whether the Government had sent the official communication required by paragraph 62.1 of the Interim Order.  The Emergency Arbitrator confirmed on 30 August 2019 (18:26) that no communication had yet been received.  On 30 August 2019 (19:04), the Solicitor General of the Government confirmed receipt of the Interim Order and informed the Emergency Arbitrator that they would be seeking a variation of the Interim Order.  The Emergency Arbitrator responded on 30 August 2019 (19:12) with the following message: "*I note that you are instructed to apply for a*

*variation of the Interim Order. I look forward to receiving that application promptly and I will rule upon it as soon as practicable. In the meantime, the Interim Order remains in full force and effect and I should be grateful for your update on the Government's compliance with the same.*"  SL Mining also wrote to the Solicitor General on 30 August 2019 (20:42) requesting immediate compliance with the Interim Order and reserving its right to seek a monetary penalty for non-compliance.

31.   On 30 August 2019 (22:15), SL Mining filed its Request for Arbitration (**Request for Arbitration**) and supporting documents, including a witness statement from Craig Dean, CEO of Gerald International Limited, which is the ultimate parent company of SL Mining.

32.   On 2 September 2019 (17:43), SL Mining requested declaratory relief in relation to the Interim Order as well as an order imposing a monetary penalty on the Government for non-compliance and for costs.   On 2 September 2019 (18:46), the Emergency Arbitrator requested the Government's response to SL Mining's application by 10am (London time) on 3 September 2019.  On 3 September 2019 (10:11), SL Mining reaffirmed its application. On 3 September 2019 (10:21), the Emergency Arbitrator noted that no communication had been received by the Government and confirmed that:

> (i) the Interim Order of 30 August 2019 remains in full force and effect notwithstanding the Government's communication to the effect that it will be seeking a variation of the Interim Order;
>
> (ii) the Government is obliged to comply with the Interim Order by virtue, inter alia, of Article 29.2 of the ICC Rules;
>
> (iii) the Government has failed to comply with the Interim Order until the present time.
>
> SL Mining's application for the imposition of a monetary penalty on the Government for its non-compliance with the Interim Order and for costs is reserved for the hearing on 6 September 2019.

33.   On 3 September 2019 (10:49), the Solicitor General of the Government sent an email with, *inter alia*, the following statement:

> Please note that Government has been informed about the Interim Order dated 30th August, 2019 and we await their response. However, as the Applicant Counsel should be well aware, the mode of execution against Government is different from that of execution against private individuals. We still want to register our willingness and readiness to participate in the emergency proceedings as we are of the firm conviction that we have a good case on merit to dismiss the applicant's application.

34.   On the same day (12:35), SL Mining requested that the Emergency Arbitrator reaffirm the

contents of his email of 3 September 2019 (10:21).  The Emergency Arbitrator did so by email of the same day (12:48).

35.    On 3 September 2019, the Secretariat of the ICC informed the Parties and the Emergency Arbitrator that the President of the ICC International Court of Arbitration had extended the deadline for the order of the Emergency Arbitrator to 8 September 2019.

36.    On 3 September 2019 (19:14), the Government requested an extension for the filing of its Reply until midday (London time) on 4 September 2019.  SL Mining stated by email (20:56) that it would agree to that extension if it were to be granted an extension for the filing of its Rejoinder until 6pm London time on 5 September 2019.  The Emergency Arbitrator granted both extensions on 4 September 2019 (06:51).

37.    On 4 September 2019 (13:15), SL Mining noted that the Government had failed to file its Reply by the fixed deadline.  The Government sent an email on 4 September 2019 (21:59) stating that it had uploaded the Reply and accompanying documents (including Witness Statements from the Director of Mines Mr Peter Kapr Bangura and the Minister of Mines and Mineral Resources Mr Foday Rado Yokie).  SL Mining sent a communication the same day (22:34) by which it noted that only three documents had in fact been unloaded:  (i) Introductory Statement, (ii) Answer to the Applicant's Application for Emergency Measures, and (iii) Witness Statement of Peter Kapr Bangura.  The Government and SL Mining then exchanged emails in relation to the uploading of the documents (Government at 23:15, SL Mining at 23:30, Government on 5 September 2019 at 00:15, SL Mining at 00:27, SL Mining at 10:52).

38.    On 5 September 2019 (11:35), SL Mining sought relief on the basis that the Government had failed to file its Reply and accompanying documents by the deadline of midday (London time) on 4 September 2019.  On 5 September 2019 (13:10), the Emergency Arbitrator fixed a final deadline of 2pm London time on 5 September 2019 for the Government to submit any further evidence in relation to its Reply.

39.    On 5 September 2019 (15:45), SL Mining noted that the Government had filed no further evidence since the Emergency Arbitrator's directions and requested an order to the effect that no further evidence would be admitted onto the record.

40.    On 5 September 2019 (15:52), the Government resent by email the documents it had previously uploaded save that the Witness Statement of the Minister of Mines and Mineral

Resources Mr Foday Rado Yokie was included.  The same day (16:51), the Government sent a list of exhibits accompanying the Witness Statement of the Director of Mines Mr Peter Kapr Bangura but those documents were not attached to the email.  The same day (16:59), SL Mining requested confirmation that new evidence would not be admitted onto the record and requested an extension to file its Rejoinder.  The same day (17:36), the Government sent by email three exhibits accompanying the Witness Statement of the Director of Mines Mr Peter Kapr Bangura.

41.   On 5 September 2019 (17:54), the Emergency Arbitrator gave the following directions:

> Since [the Emergency Arbitrator's directions at 13:10 on 5 September 2019] were issued, I have received three emails from Mr Mohamed Bangura on behalf of the Government.  The first email (15:52) contains documents that were already unloaded to the electronic platform save that the Witness Statement from the Minister of Mines and Mineral Resources was filed for the first time.  The second email (16:51) purports to attach the exhibits to this same witness statement, but none of the documents listed in the email are actually attached to it.  The third email (17:36) attaches the first three exhibits to the witness statement.

> The directions set out in my email below made it clear that no further evidence would be admitted after the deadline of 2pm London time on 5 September 2019.  That deadline expired before the first email from Mr Mohamed Bungura on behalf of the Government.  It was thereafter incumbent upon the Government to request the leave of the Emergency Arbitrator to file any further evidence before it was adduced.  No such request has been made.

> The Emergency Arbitrator is prepared, exceptionally, to allow the Witness Statement from the Minister of Mines and Mineral Resources onto the record.  He will thus be invited to attend the hearing as a witness together with Mr Peter Kapr Bangura on behalf of the Government.  No other evidence will be admitted onto the record at this stage.   I will hear the Parties' submissions on how any documents filed by the Government after the deadline of 2pm London time today should be dealt with at the hearing tomorrow.  For the avoidance of doubt, SL Mining will not be expected to address any documents filed after that deadline (save for the Witness Statement from the Minister of Mines and Mineral Resources) in its Rejoinder which is due to be filed later today.

> SL Mining has requested, by its email today (16:59), an extension to file its Rejoinder until 10pm London time today.  That extension is hereby granted.

42.   On 5 September 2019 (18:06), SL Mining circulated an agenda for the hearing that had been agreed by both Parties.

43.    On 5 September 2019 (18:50), the Government sent a further exhibit to the Witness Statement of the Director of Mines Mr Peter Kapr Bangura.  The same day (20:38), the Government wrote in relation to the Emergency Arbitrator's directions of 5 September 2019 (17:54) to the effect that those directions did not take into account the challenges with the internet in Sierra Leone and therefore may compromise the fairness and justice of the process.  The same day (21:09), the Government sent two further exhibits to the Witness Statement of the Director of Mines Mr Peter Kapr Bangura.

44.    On 5 September 2019 (22:08), SL Mining filed its Rejoinder to the Reply of the Government of Sierra Leone (**Rejoinder**) and accompanying documents.

45.    On 6 September 2019 (10:28), the Government requested leave to file further documents. In response, the Emergency Arbitrator gave the following directions on the same day (11:10):

> I acknowledge receipt of the Government's email below by which it has applied to introduce evidence into the record after the deadline of 2pm London time on 5 September 2019.

> I appreciate that the Government has had logistical problems in uploading its documents.  The primary reason for the deadline, however, was to ensure that the Applicant had sufficient time to review the Government's evidence in order to be in a position to respond to it in its Rejoinder.  That is no longer possible.  It is also the case that the Applicant and its witness and the Emergency Arbitrator will not have sufficient time to review the evidence before the hearing either.

> For these reasons, I will invite submissions from the Parties at the hearing as to how the evidence filed by the Government after the deadline should be dealt with in these proceedings.  Until this issue is determined by the Emergency Arbitrator, the documents filed by the Government after the deadline will not form part of the record of this arbitration.

46.    On 6 September 2019 (10:57), the Government circulated a link to an electronic platform containing the Exhibits to the Respondent's Introductory Statement and the Exhibits to the Witness Statement of the Director of Mines Mr Peter Kapr Bangura.  The same day (11:28), the Government sent by email a further exhibit to the same witness statement.  The same day (14:05), SL Mining filed a full version of a document that the Emergency Arbitrator had previously noted had a page missing (Exhibit C-3).

47.    The hearing commenced at 3pm London time on 6 September 2019 by telephone.  The following people were in attendance:

**Emergency Arbitrator**
Professor Zachary Douglas QC

**Applicant**
John Savage QC, King & Spalding LLP
Ema Vidak Goijkovic, King & Spalding International LLP
Kenneth R. Fleurier, King & Spalding LLP
Charles B. Rosenberg, King & Spalding LLP
Alex Strong, SL Mining
Craig Dean, Gerald Mining International

**Respondent**
Osman I. Kanu (Lead Counsel)
Mohamed Lamin Tarawalley (Solicitor-General)
Peter Kapr Bangura, Director of Mines

48.   The following factual witnesses gave oral evidence at the hearing:

48.1.  For the Applicant: Craig Dean, CEO of Gerald Mining International

48.2.  For the Respondent: Peter Kapr Bangura, Director of Mines.

48.3.  The Hon Foday Rado Yokie, Minister of Mines and Mineral Resources, although having submitted a witness statement, was not available to attend the hearing.

49.   At the conclusion of the hearing, the Parties agreed that both the Witness Statement of The Hon Foday Rado Yokie, Minister of Mines and Mineral Resources, as well as the evidence filed by the Respondent after the deadline of 2pm London time on 5 September 2019, were admitted onto the record of these proceedings and that the Emergency Arbitrator could give whatever weight to that evidence as he deemed appropriate in circumstances where (i) the Applicant has not had an opportunity to test that evidence at the hearing or in written submissions and (ii) the Emergency Arbitrator's jurisdiction in respect of the merits of the dispute is limited to determining whether there is a serious issue to be tried in respect of the Applicant's underlying claim.[2]

50.   On 7 September 2019 (11:02), SL Mining circulated a transcript of the hearing to the Emergency Arbitrator and the Government.

51.   On 7 September 2019, the Government (at 16:56) and SL Mining (at 16:58) filed their costs submissions in accordance with their agreed schedule.

---

[2]      Transcript, P114 (Douglas/Savage/Kanu).

## B     GOVERNING LAW AND ARBITRATION CLAUSE

52.     The governing law and arbitration clause is contained in Article 6.9 of the Agreement:

> 6.9 Interpretation and Arbitration
>
> a) Except as may be otherwise herein expressly provided, this Agreement shall be construed, and the rights of GOSL and SL Mining hereunder shall be determined, according to the Laws of Sierra Leone.
>
> b) The parties shall in good faith endeavour to reach an amicable settlement of all differences of opinion or disputes which may arise between them in respect to the execution performance and interpretation or termination of this Agreement, and in respect of the rights and obligations of the parties deriving therefrom.
>
> c) In the event that the parties shall be unable to reach an amicable settlement within a period of 3 (three) months from a written notice by one party to the other specifying the nature of the dispute and seeking an amicable settlement, either party may submit the matter to the exclusive jurisdiction of a Board of 3 (three) Arbitrators who shall be appointed and carry out their mission in accordance with the International Rules of Conciliation and Arbitration of the International Chamber of Commerce (ICC). The venue of the arbitration shall be London, England. The English language shall be used in the proceedings. The award and any decision of the Arbitration Board shall be final and binding and enforceable in and by the courts of Sierra Leone upon either party having the same force and effect as a judgment of a court of the last resort of the Republic of Sierra Leone or any other appropriate jurisdiction.
>
> d) In the event of any notified dispute hereunder, both parties agree to continue to perform their respective obligations hereunder until the dispute has been resolved in the manner described above.

53.     The law applicable to the rights and obligations of the Parties under the Agreement is the law of Sierra Leone in accordance with Article 6.9(a).


## C     REQUESTS FOR RELIEF

54.     The Applicant's request for relief is set out in paragraphs 72-74 of its Application:

> 72. SL Mining respectfully requests that the Emergency Arbitrator order the Government to:
>
> 72.1 lift the shipping prohibition within two (2) days from the issuance of the emergency order and inform SL Mining and the Emergency Arbitrator;
>
> 72.2 not take any steps or actions that restrict SL Mining from

exporting all iron ore and associated minerals or mineral concentrates raised or obtained in the course of mining operations to any country other than countries to which the laws of the Republic of Sierra Leone prohibit such exports;

72.3 not take any steps to enforce the direction dated 24 July 2019 prohibiting SL Mining from all works in or over Licence No ML 01/2017 in respect to shipping, nor any steps in respect of SL Mining not complying with that direction;

72.4 not take any steps that would interfere with or prohibit SL Mining from engaging in activities permitted under the Large Scale Licence Agreement or Licence No ML 01/2017;

72.5 refrain from further aggravating the present dispute;

72.6 pay to SL Mining all costs associated with this Application, including but not limited to SL Mining's attorneys' fees and expenses, the fees and expenses of the Emergency Arbitrator, and the ICC administrative expenses; and

72.7 order any other relief that the Emergency Arbitrator deems just and proper.

73. SL Mining further requests that, pursuant to Article 1(6) of Appendix V of the ICC Arbitration Rules, the Emergency Arbitrator extend the 10 day deadline for submitting the Request for Arbitration until 14 October 2019 in accordance with the three-month waiting period in Clause 6.9(c) of the MLA, to the extent the Emergency Arbitrator determines that the waiting period applies here.

74. SL Mining reserves the right to amend the relief requested in this Application.

55.   The Respondent's request for relief is set out in paragraph 48 of its Reply:

In view of the losses claimed by the Respondent bordering on fraud the Respondent in regard the emergency measures invite the Emergency Arbitrator to dismiss the application with costs.

## D    JURISDICTION AND ADMISSIBILITY

56.   The jurisdiction and/or admissibility conditions for the granting of emergency measures are set out in Article 29 of the ICC Rules, which provide, in relevant part:

1)
A party that needs urgent interim or conservatory measures that cannot await the constitution of an arbitral tribunal ("Emergency Measures") may make an application for such measures pursuant to the Emergency Arbitrator Rules in Appendix V. Any such application shall be accepted

only if it is received by the Secretariat prior to the transmission of the file to the arbitral tribunal pursuant to Article 16 and irrespective of whether the party making the application has already submitted its Request for Arbitration.

[…]

5)
Articles 29(1)-29(4) and the Emergency Arbitrator Rules set forth in Appendix V (collectively the "Emergency Arbitrator Provisions") shall apply only to parties that are either signatories of the arbitration agreement under the Rules that is relied upon for the application or successors to such signatories.

6)
The Emergency Arbitrator Provisions shall not apply if:

a) the arbitration agreement under the Rules was concluded before 1 January 2012;

b) the parties have agreed to opt out of the Emergency Arbitrator Provisions;

or

c) the parties have agreed to another pre-arbitral procedure that provides for the granting of conservatory, interim or similar measures.

57.   The Respondent has raised no issue in respect of the Emergency Arbitrator's jurisdiction or the admissibility of the Application.

58.   The Emergency Arbitrator is satisfied that:

58.1.   The Emergency Arbitrator has jurisdiction by virtue of the incorporation of the ICC Rules by reference in the arbitration agreement in Article 6.9 of the Agreement, which has been signed and executed by both Parties (ICC Rules, Art. 29(5));

58.2.   The dispute, which concerns the rights and obligations of SL Mining and the Government, clearly falls within the scope of the arbitration agreement in Article 6.9 of the Agreement;

58.3.   SL Mining's Application was received by the ICC Secretariat before the transmission of the file to the arbitral tribunal (ICC Rules, Art. 29(1));

58.4.   The arbitration agreement in Article 6.9 of the Agreement was concluded after 1 January 2012 (ICC Rules, Art. 29(6)(a)) and the Parties have not opted out of the Emergency Arbitrator Provisions or agreed to another pre-arbitral procedure that

provides for the granting of conservatory, interim or similar measures (ICC Rules, Art. 29(6)(b) & (c));

58.5. The Application for emergency measures cannot await the constitution of the arbitral tribunal for the reasons set out in Section F3 of this Order.

59. The Emergency Arbitrator is also satisfied, that Article 6.9(c) of the Agreement, which provides for a period of three months to allow the Parties to reach an amicable settlement, does not prevent SL Mining from filing an Emergency Application.  Article 6.9(c) of the Agreement is directed to the amicable settlement of the substance of any dispute, whereas an Emergency Application is directed to the preservation of the rights of a party pending an amicable settlement of the dispute or its adjudication by an arbitral tribunal.  There does not appear, therefore, to be any conflict between Article 6.9(c) of the Agreement and SL Mining's Application.

# E   THE BACKGROUND TO THE AGREEMENT

60. On 29 March 2017, the Government of Sierra Leone and SL Mining entered into the Large-Scale Mining Licence No ML 01/2017, which was granted under the Mines and Minerals Act 2009 (the **Licence**) in respect of the Marampa Mine in the Port Loko District of Sierra Leon.[3]  The Marampa Mine contains high-grade iron ore.  The Licence was issued for a term of 25 years.

61. On 5 December 2017, the the Government of Sierra Leone and SL Mining Limited executed the Agreement (or **MLA**).[4]  The Agreement was ratified by the Parliament of Sierra Leone on 6 December 2017.[5]

62. The basic terms of the Agreement are as follows.  SL Mining is entitled to explore and mine iron ore in the Marampa area and then export it.[6]  The Government, in return, is entitled to a royalty of 3% of the market value of the iron, which is calculated to be the sale value receivable by SL Mining in an arm's length transaction sold Free on Board the vessel.[7]  In addition, SL Mining is obliged to make payments in accordance with a community

---

[3]   Exhibit C-2.
[4]   Exhibit C-3.
[5]   Exhibit C-3.
[6]   Agreement, Clauses 2.1(c) & 4.6.
[7]   Agreement, Clause 5.2(a)

development programme in the different amounts over the term of the Agreement ranging between 0.5% and 1% of SL Mining's Free on Board revenue over a particular year.[8]

# F   THE REQUIREMENTS FOR THE GRANT OF EMERGENCY MEASURES

## F1   Introduction

63.   Both Parties have accepted, for the purposes of this Application, that the test formulated by the House of Lords in *American Cyanamid Co (No 1) v Ethicon Ltd* [1975] AC 396 should be followed by the Emergency Arbitrator.[9]   Lord Diplock explained the function of an interim injunction as follows:

> The object of the interlocutory injunction is to protect the plaintiff against injury by violation of his right for which he could not be adequately compensated in damages recoverable in the action if the uncertainty were resolved in his favour at the trial; but the plaintiff's need for such protection must be weighed against the corresponding need of the defendant to be protected against injury resulting from his having been prevented from exercising his own legal rights for which he could not be adequately compensated under the plaintiff's undertaking in damages if the uncertainty were resolved in the defendant's favour at the trial. The court must weigh one need against another and determine where 'the balance of convenience' lies.

64.   In accordance with this test in *American Cyanamid*, there are four considerations that must be weighed in exercising a power to grant an interim injunction or emergency measures:

64.1.   Is there a serious question to be tried?

64.2.   Is the applicant exposed to irreparable harm?

64.3.   Where does the balance of convenience lie?  This final limb incorporates the question of urgency in the sense that the application will only succeed if there is a probability that the irreparable harm will occur.

---

[8]        Agreement, Clause 5.18(b).
[9]        Applicant: Rejoinder, §20. Respondent: Reply, §4.

**F2    Is there a serious question to be tried?**

65.    SL Mining has pleaded a series of claims against the Government in its Request for Arbitration:[10]

   65.1.    "Executive Order No 1 Violated the MLA [the Minerals and Mining Act 2009] and the Constitution of Sierra Leone";

   65.2.    "The Licence Suspension Violated the MMA and the MLA";

   65.3.    "The Export Prohibition Violates the MMA and the MLA";

   65.4.    "The Government's Attempt to Impose Arbitrary and Unreasonable '*Terms and Conditions*' to Allow SL Mining to Resume Shipping Violated the MMA, the MLA, and the Companies Act";

   65.5.    "The Government's Attempts to Intimidate and Damage SL Mining to Pressure It to Comply with the Government's Unlawful Demands Have Aggravated the Dispute".

66.    The focus of the Application and the relief requested therein, as well as the focus of the hearing and the numerous conference calls with the Parties that preceded it, has been the alleged breach of the Agreement occasioned by the Government's prohibition on the exporting of iron ore from the Marampa Mine.  The Emergency Arbitrator will confine his interlocutory assessment of the merits to the Applicant's claim on this basis because this is the claim that is most closely linked with the interim relief requested.  In other words, if there is a serious question to be tried in respect of this claim, then this limb of the test for emergency measures will be satisfied.

67.    The Applicant's claim in relation to the export prohibition is founded primarily upon Article 4.6 of the Agreement,[11] which reads:

> Subject to Section 113(5), and Section 167 of the Minerals Act, SL MINING shall have the right to export all iron ore and associated minerals or mineral concentrates raised or obtained in the course of mining operations to any country other than countries to which the laws of the Republic of Sierra Leone prohibit such exports.

---

[10]    Applicant's Request for Arbitration, §§26-54.
[11]    Applicant's Request for Arbitration, §39.

68. Section 113(5) of the Mines and Minerals Act 2009 (relating to the amendment of the programme of operations of a large-scale mining licence in the event of discoveries of further deposits of the same mineral to which the licence relates or other minerals to which it does not) and section 167 of the Minerals Act (concerning the discovery of precious metals) do not appear to have any relevance in the present circumstances.

69. The Emergency Arbitrator will now consider the factual background to the Applicant's claim to determine whether there is a serious question to be tried.

70. The Government of Sierra Leone changed in April 2018. His Excellency Rtd Bragadier Juilius Maado Bio was elected President and assumed office on 4 April 2018. On 9 April 2018, the Government passed Executive Order No 1, which suspended all duties and tax waivers for all companies in Sierra Leone. Following correspondence between the Parties,[12] the Minister of Finance confirmed by letter of 30 October 2018 that the "*tax exemption privileges accorded to organizations, companies and contractors in agreements ratified by Parliament or covered under special Conventions that are still in force*" will remain applicable.[13]

71. On 16 June 2019, SL Mining made its first shipment of 55,000 tons of high-grade iron ore.[14] The Minister of Mines and Minerals of Sierra Leone, Hon. Rado Yokie, was quoted in the Sierra Leone Telegraph as saying as follows:

> Today is a historic day. As Marampa Blue is a very high-grade ore, and coming from Sierra Leone, it sends a good signal to the world that this Country is ready for business. It is a feather to Sierra Leone's mining cap.[15]

72. On 3 July 2019, the Minister of Mines and Mineral Resources wrote to SL Mining in the following terms:

> TEMPORARY SUSPENSION ORDER OF MINERAL RIGHTS – ML 01/2017
>
> By the powers vested in me under Section 52 of the Mines and Minerals Act 2009, I hereby direct that all work in or over the above licence in respect to mining, processing, hauling and shipping activities shall cease forthwith.
>
> This order is imposed pursuant to Section 52(1) of the Act for the

---

[12]     Exhibits C-5, C-6, C-7, C-8.
[13]     Exhibit C-9.
[14]     Exhibit C-11.
[15]     Exhibit C-11.

following reason(s):

- Contravened provisions of this Act and specific conditions of your mineral right and Mining Lease Agreement.

- Made statement to the government in connection with your mineral right which you knew or ought to have known to be false.

Most importantly, we have been advised by the office of the Attorney General and Ministry of Justice that they are seized of information pertaining to corrupt practices involving SL Mining Limited and they are intending to undertake much needed investigation regarding the same.

This temporary suspension shall lapse after twenty-one calendar days of the date herein unless lifted earlier by notice in writing or extended for such term as shall be directed.

Any suspension or cancellation as a consequence of this order shall be without prejudice to any liabilities or obligations under the licence regarding any provisions of the Act and its regulations before or after the date of the suspension or cancellation.

73. That is the full text of the Minster's letter (the ***Temporary Suspension Order***). No particulars of the accusations levelled at SL Mining were provided in this letter.

74. On the same day (3 July 2019), the Minister of Mines and Mineral Resources gave a speech to the staff at the Ministry of Mines and Mineral Resources and the National Minerals Agency. The Press Release from the National Minerals Agency records that:

The Minister pledged his commitment to revisit all mining agreements, and cancel those that are not in the interest of the people of this Country, while also ensuring that Mineral Rights are given to credible investors. He called on the technical staff of the NMA to work with him in this direction and to ensure synergy between the Agency and the Ministry for the good of the country.[16]

75. According to the witness Craig Dean, the CEO of Gerald International Limited (SL Mining is one of its wholly-owned subsidiaries), he attended a meeting with the Minister of Mines and Mineral Resources on 8 July 2019 at which the Minister "*candidly stated that the driver behind the suspension of SL Mining's licence was purely to seek to renegotiate the terms of the MLA [ie the Agreement] and that this tactic was to bring us to the negotiating table*".[17] Mr Dean was not cross-examined on this point at the hearing. The Minister of Mines and Mineral Resources

---

[16] Exhibit C-17.
[17] Witness Statement of Craig Dean, §12.

contradicted this account in his Witness Statement:

> In one of our meetings with the SL Mining, I categorically told them it was time for me to redeem myself and this country and make certain things right again. My intention by this statement was to ensure that all mining companies operating in Sierra Leone comply with our regulations. My statement I have learnt has been misquoted by the applicant to mean that I wanted to put unnecessary pressure on them to renegotiate the MLA.[18]

76.   The Minister did not, however, attend the hearing and thus could not be cross-examined on his written testimony.

77.   Mr Dean's testimony on this issue appears to be corroborated by contemporaneous documentary evidence.   On 10 July 2019, the Minister of Mines and Mineral Resources wrote to SL Mining inviting them to a meeting with the Government.   The text of the letter reads:

> I write to invite you to a very important meeting on Monday 14th July 2019 at 10am in the Ministry of Finance Conference room. The purpose of the meeting is to follow up on initial discussions relating to the renegotiation of the existing Mining Lease Agreement between SL Mining Limtied and the Government of Sierra Leone.
>
> I have attached to this letter a copy of the existing MLA [Agreement] for ease of reference.[19]

78.   Thus, only seven days after the Temporary Suspension Order, the Minister of Mines and Mineral Resources was proposing to renegotiate the Agreement with SL Mining.

79.   On 24 July 2019, the Minister of Mines and Mineral Resources wrote to SL Mining in relation to the Temporary Suspension Order.   He stated:

> While I am aware that the twenty-one days (21 days) suspension period expires on 23rd July 2019 and that you are planning to recommence activities on 24th July 2019.  I am directly that you limit all such activities to only mining processing and hauling.
>
> I am further strongly directing that all works in or over the above licence (i.e. ML/01/2017) in respect to shipping remains temporary suspended until such a period when the issues outlined in my letter of 3rd July, 2019 are adequately addressed.[20]

---

[18]    Witness Statement of The Hon Foday Rado Yokie, Minister of Mines and Mineral Resources, §16.
[19]    Exhibit C-14.
[20]    Exhibit C-20.

80.   On 6 August 2019, the Minister of Mines and Mineral Resources gave an interview to the Sierra Leone Telegraph in which he stated that the suspension of exports in force in respect of SL Mining would be "*while the Mining Licence Agreement is renegotiated*".[21]

81.   Finally, the Minister of Mines and Minerals sent a further letter to SL Mining on 13 August 2019.  In this letter, the Minister set out his conditions for the lifting of the prohibition on the shipment of iron ore from the Marampa Mine:

> Having reviewed the submitted documentation before us and giving due consideration to the facts we have been able to establish, I wish to inform you that as a matter of good faith, I could lift the restriction on the shipment of iron ore (Marampa Blue) from Sierra Leone provided that SL Mining Ltd satisfactorily fulfills the following terms and conditions:
>
> 1.   Pursuant to clause 4.16 of the Mining Lease Agreement (MLA), SL Mining Limited to immediately pay to the Government of Sierra Leone (GoSL) USD 1 million Performance Bond, having failed to make substantial progress towards the re-opening of the Marampa Mine within a period of 12 months from the date of ratification of the MLA.
>
> 2.   Pursuant to Clause 5.2 (c) of the said MLA, SL Mining Ltd to immediately commence and complete negotiations of an Advance Pricing Agreement with the GoSL establishing guidelines for determining the deemed arm's length sale value and price of such minerals for purposes of the calculation of royalty.
>
> 3.   SL Mining Limited to immediately make full royalty payment for the three shipments undertaken in June 2019 and July 2019 of Marampa Blue in accordance with arm's length calculations as per the Mines and Minerals Act 2009.
>
> 4.   SL Mining Limited to make advance payment of royalty to the GoSL for every five shipments of Marampa Blue in accordance with arm's length calculations as per the Mines and Minerals Act 2009.
>
> 5.   SL Mining Limited to provide fully audited Financial Statements for 2017 and 2018 to enable the calculation of Chargeable lncome.
>
> 6.   SL Mining Limited to agree with the GoSL on a phased payment plan for the use of Marampa Mining Asset (as per Section 54 of the Mines and Minerals Act 2009) valued by the GoSL at USD 16 million.
>
> 7.   SL Mining Limited and GoSL to agree in principle to mutually revisit/renegotiate some of the clauses in the MLA against 30th

---

[21]        Exhibit C-22.

September 2019.[22]

82.   The final condition expressly contemplates that the shipping prohibition might be lifted only if some of the clauses of the Agreement are renegotiated.

83.   It will be recalled that SL Mining's claim is based on Article 4.6, which reads:

> Subject to Section 113(5), and Section 167 of the Minerals Act, SL MINING shall have the right to export all iron ore and associated minerals or mineral concentrates raised or obtained in the course of mining operations to any country other than countries to which the laws of the Republic of Sierra Leone prohibit such exports.

84.   At no point in the exchanges between the Government and SL Mining did the Government justify its shipping prohibition on the basis that SL Mining had been or was planning to ship iron ore to "*any country other than countries to which the laws of the Republic of Sierra Leone prohibit such exports*". The Government's actions on the basis of the evidential record available to the Emergency Arbitrator do not, therefore, appear to be able to be justified as giving effect to this aspect of Article 4.6 of the Agreement. There is, therefore, a serious question to be tried as to whether the Government's Temporary Suspension Order violates Article 4.6 of the Agreement.

85.   It will be recalled that the Temporary Suspension Order was issued pursuant to section 52 of the Mines and Mineral Act 2009 (the **Act**). That legislative provision reads:

> 52.   (1) The Director, or any person authorised by the Director, may, in writing, order reconnaissance, exploration or mining operations to be temporarily suspended on an emergency basis, regardless of whether such operations are authorized by a mineral right, until such arrangements are made that are in Director's opinion necessary to prevent danger to life, property or the environment or to comply with this Act.
>
> (2) The Director may cancel or vary the terms of any temporary suspension order.
>
> (3) The Minister shall have the power to confirm a temporary suspension order made by the Director and may not delegate this power.
>
> 4) A temporary suspension order shall lapse after twenty one days of its issuance, unless it is confirmed, in writing, by the Minister.

---

[22]   Exhibit C-25.

86.   The first element of section 52(1) of the Act is that the temporary suspension relates to "*reconnaissance, exploration or mining operations*".  It does not appear to cover the prohibition of shipping of any product resulting from mining operations.

87.   The second element is that such operations can be suspended "*on an emergency basis*".  At the hearing, the Director of Mines testified that there was no requirement of an emergency for the issuance of a temporary suspension order under section 52 of the Act given that one of the purposes of section 52 was to ensure "*compliance with the Act*". [23] This interpretation, however, is difficult to reconcile with the text of section 52, which refers to an "*emergency basis*" as a general feature of the temporary suspension, as well as the fact that compliance with the Act is listed alongside "*danger to life, property or the environment*".  It would seem incongruous for a general power to suspend mining activities to ensure compliance with any provision of the Act to be included in the interstices of section 52, which refers to "*emergency*" and "*danger to life, property or the environment*" and provides that any temporary suspension will automatically lapse after twenty-one days.  If there is a requirement of an emergency for the power in section 52 to be deployed, it is noted that the Minister of Mines and Mineral Resources did not refer to any emergency in his Temporary Suspension Order and indeed testified that he did not consider that an emergency situation existed at least in relation to SL Mining's Application.[24]

88.   The third element of section 52 of the Act is that the temporary suspension order must be directed to "*prevent danger to life, property or the environment or to comply with this Act*".  It has never been suggested by the Government either contemporaneously or during the course of these proceedings that the Temporary Suspension Order was necessary to prevent danger to life, property or the environment.  It thus falls to consider whether the Temporary Suspension Order was direct to SL Mining's compliance with the Act.

89.   The Minister in his letter of 3 July 2019 did refer to the contravention of (unspecified) provisions of the Act and unparticularized allegations of false representations and corrupt practices on the part of SL Mining.  Whilst it is clear that one of the purposes of a temporary suspension order is to ensure that the addressee complies with the Act, the addressee obviously must be put on notice of the provisions of the Act, which, in the Government's estimation, it has failed to comply with.  Only then would the addressee be in a position to

---

[23]     Transcript P69 (Bangura/Rosenberg).
[24]     Witness Statement of The Hon Foday Rado Yokie, Minister of Mines and Mineral Resources, §16.

take corrective measures to comply with the Act—which is the only legitimate objective for the issuance of the temporary suspension order pursuant to section 52(1) of the Act (save where the order is necessary to prevent danger to life, property or the environment, which appears to be irrelevant in this case).

90.     The Minister of Mines and Minerals did eventually particularize his complaints in respect of SL Mining in his letter of 13 August 2019—more than a month after the Temporary Suspension Order had been issued.  The conditions set out in that letter that SL Mining would have to comply with in order for the Temporary Suspension Order to be lifted do not, in significant part at least, appear to have anything to do with SL Mining's compliance with specific provisions of the Act.

91.     The Emergency Arbitrator finds that there is also a serious question to be tried in respect of whether the Temporary Suspension Order was issued lawfully on the basis of section 52 of the Act and, even if it were, whether it would provide a contractual defence to SL Mining's claim for breach of Article 4.6 of the Agreement.  There is substantial evidence on the record before the Emergency Arbitrator that suggests that the reason for the Temporary Suspension Order was to put pressure on SL Mining to renegotiate the commercial aspects of the Agreement.

**F3     Is SL Mining exposed to irreparable harm?**

92.     During the proceedings, SL Mining represented that it had accumulated over 739,000 wet metric tonnes (***WMT***) of iron ore concentrate in stockpiles at the Marampa Mine and associated areas as at 28 August 2019 as a result of the Temporary Suspension Order.[25]  This was broken down as follows:

| Location | Iron Ore Concentrate Stock As of 27 Aug. 2019 (WMT) | Normal Capacity (WMT) |
| --- | --- | --- |
| Production plant (PLO (Plant Load Out)) | 335,747 | 200,000 |
| TLO (Train Load Out) | 210,857 | Not usually used for storage |
| River Port (TRT (Thofeyim River Terminal)) | 183,716 | 120,000 |

---

[25]     Email from SL Mining to the Government and the Emergency Arbitrator, 28 August 2019 (00:53).

| Coasters | 9,510 | Not usually used for storage |
| --- | --- | --- |
| Total stockpiles: | 739,830 | |

93. This, according to SL Mining, is significantly in excess of the stockpiles that are created under normal operating conditions:

> The stockpile at the production plant has more than 335,000 WMT of iron ore concentrate, which is significantly more than its 40,000-50,000 WMT working level capacity and 200,000 WMT maximum capacity. The stockpile at the river port has nearly 184,000 WMT of iron ore concentrate, which is significantly more than its 120,000 WMT capacity.[26]

94. Mr Dean testified at the hearing that the stockpile was now (i.e. as at 6 September 2019) more than 750,000 tonnes.[27] SL Mining's counsel further confirmed at the hearing that production had been shut down on 31 August 2019 to bring forward certain maintenance and overhaul works that can only be performed when the plant is not operating.[28] It was further stated that a decision to put the Marampa Mine into care and maintenance would have to be made over the weekend of 7-8 September 2019 or shortly thereafter in the absence of any further mitigating options.[29]

95. Mr Dean gave the following evidence in his Witness Statement of 20 August 2019 on the likely consequences of putting the Marampa Mine into care and maintenance:

> 28. Placing a mining project into care and maintenance can have grave consequences. Notably, the prior operators of the Marampa Project - London Mining Company and Timis SL - were unable to recommence operations and then entered into liquidation and receivership (respectively) after being placed into care and maintenance.
>
> 29. If the Marampa Mine is placed into care and maintenance, SL Mining will suffer significant and potentially permanent reputational harm. SL Mining earned an impressive reputation for being able to quickly restart iron ore production at the Marampa Mine. Unfortunately, that reputation has been damaged because customers and the market can see that no further shipments are being made. Our reputation will be harmed further if we are forced to stop production for a second time and place the mine into care and maintenance.
>
> 30. Placing the mine into care and maintenance will mean that SL Mining will be forced to lay off its employees and contractors. If this were to occur, then based on my experience, I expect that many of these

---

[26]    Email from SL Mining to the Government and the Emergency Arbitrator, 28 August 2019 (00:53).
[27]    Transcript P46 (Dean).
[28]    Transcript P18 (Savage).
[29]    Transcript P18 (Savage).

individuals would obtain alternative employment and not return to SL Mining in the event that we later attempt to reopen the mine. They would have new employers, have possibly moved away from the area, and would be reluctant to rejoin SL Mining due to the uncertainty and risk of the Government ordering the mine to shut down again. Losing our experienced employees and consultants would significantly hinder SL Mining's ability to reopen the Marampa Mine in the future, as first-hand knowledge of the mine site, the mining seams, the processing machinery, and know-how are critical in the highly-techichal field of mining.

31. I also fear that layoffs may lead to dangerous riots, protests, and civil disruptions, which may cause further damage to the mine site and impede or prevent SL Mining's ability to reopen the Marampa Mine in the future. I recall that serious riots, protests, and civil disruptions occurred when mines operated by Timis SL and African Minerals entered into care and maintenance in Sierra Leone.

32. There also is a high risk that local suppliers of the Marampa Project may go out of business and never reopen, which would further hinder our ability to restart the Marampa Project in the future and comply with our local content requirements.

33. Finally, there is a significant risk that forcing SL Mining to put the Marampa Mine into care and maintenance would permanently damage SL Mining's positive relationships with the local communities that it spent a considerable amount of time and resources to foster. SL Mining provides vital support to local schools and medical care in Sierra Leone. For example, in January 2019, SL Mining donated almost 100 tons of rice to communities surrounding the Marampa mine in support of the socio-economic welfare of families in the Lunsar region where the mine is located. Every registered household in Lunsar and the villages surrounding the mine received a 25 kg bag of rice, which recipients publicly acknowledged as the most generous charity in the history of mining operations at Marampa. If SL Mining is not in operation and unable to generate revenue, this support will no longer be provided which would be detrimental to the Lunsar and Port Loko communities and permanently affect SL Mining's future relations with the local communities.

96. The Government has not sought to challenge SL Mining's evidence on the grave consequences that would follow any decision to put the Marampa Mine into care and maintenance or that such consequences would amount to irreparable harm for the purposes of this Application. Mr Bangura, however, testified that there is further capacity for stockpiling both at the site controlled by SL Mining (approximately two weeks of additional stockpiling) and elsewhere at the Campbell Town Ridge site, which, according to Mr Bangura, has a capacity of 100,000 MT (which would represent an additional two or three

weeks of stockpiling).[30]  Mr Dean did not accept that there was any further capacity at SL Mining's site.  He also did not accept that the Campbell Town Ridge site is actually available for immediate stockpiling as it had last been used by another operator several years ago and SL Mining did not have the relevant regulatory approvals to stockpile there.[31]  In response, Mr Bangura testified that all the necessary regulatory approvals were available from the Government to stockpile at the Campbell Town Ridge site.[32]

97.  The Emergency Arbitrator cannot come to any definitive view in these proceedings on whether SL Mining's capacity for stockpiling has already been exhausted (on SL Mining's case) will be exhausted in two weeks (on the Government's case that additional capacity is still available at SL Mining's site) or whether stockpiling at an additional site might be a viable option (on the Government's case that the Campbell Town Ridge site is available).  But even if the Emergency Arbitrator were, *arguendo*, to accept the Government's case, the risk of irreparable harm would remain because the likelihood would be that the Marampa Mine would have to be put into care and maintenance in the coming weeks and that would have very grave consequences for SL Mining and the Government.  As previously stated, the Government has not challenged the proposition that putting the Marampa Mine into care and maintenance would result in irreparable harm to SL Mining.

98.  The Emergency Arbitrator concludes that there is a risk of irreparable harm for the purposes of the Application.

**F4   Where does the balance of convenience lie?**

99.  The Emergency Arbitrator is satisfied that the balance of convenience is in favour of granting an order for emergency measures for the following reasons.

100.  First, the Government will be entitled to its contractual royalties and renumeration for the proposed shipments of the iron ore concentrate.  In accordance with the Agreement, the Government, is entitled to a royalty of 3% of the market value of the iron, which is calculated to be the sale value receivable by SL Mining in an arm's length transaction sold Free on Board the vessel.[33]  In addition, SL Mining is obliged to make payments in accordance with a community development programme in the different amounts over the term of the

---

[30]     Transcript P74 (Bangura/Douglas).
[31]     Transcript P81-2 (Craig).
[32]     Transcript P83-4 (Bangura/Douglas).
[33]     Agreement, Clause 5.2(a)

Agreement ranging between 0.5% and 1% of SL Mining's Free on Board revenue over a particular year.[34]   The Government therefore will not suffer any prejudice if an order requiring the Government to lift the prohibition on shipping were to be granted; to the contrary, it would receive its normal contractual royalties and remuneration as envisaged under the Agreement.

101.   Second, all of the Government's claims against SL Mining would be fully preserved and subject to adjudication by the arbitral tribunal to be constituted pursuant to Article 6.9 of the Agreement.   The Government has summarized SL Mining's alleged breaches as follows:

> i.   Disposal of minerals to affiliates in breach of the agreed arm's-length sales obligation and without a prior Advance Pricing Agreement with Respondent;
>
> ii.   Failure to present documents requested pursuant to section 153 of the MMA;
>
> iii.   Failure to issue an obligatory performance bond in the sum of USD$ 1,000,000.00 to the Respondent and/or meet agreed targets; and
>
> iv.   Entering into an agreement with persons for the use of the operating assets of the Marampa Mine which were then under the legal custody and control of the Respondent without securing the consent or concurrence of the Respondent.
>
> v.   Failure to submit full audited financial statements for all periods since the formation of the SL Mining Company between October 2016 and October 2019.[35]

102.   The only conceivable prejudice to the Government that may result from an order lifting the shipping prohibition is in relation to the first alleged breach because the Government would forsake the opportunity to be paid the additional amount that it claims it is owed as a royalty for each shipment at the time of the shipment.   The Government will, however, be able to claim those amounts in the arbitration proceedings and, if successful, those amounts would be awarded against SL Mining by the tribunal to be constituted pursuant to Article 6.9 of the Agreement.   The Emergency Arbitrator can ensure that the Government's position is protected in the interim, nonetheless, by ordering that SL Mining pay an amount broadly

---

[34]     Agreement, Clause 5.18(b).
[35]     Government's Reply, §8.1.

equivalent to the additional amount that the Government considers that it is entitled to into an escrow account.

103. The possibility of protecting the Government's alleged interest through SL Mining's payment into an escrow account was discussed at length during the course of the proceedings.  It was the Government's position, while the SL Mining's application for an Interim Order was under consideration, that if the prohibition on shipping the iron ore were to be lifted, then:

> [W]e would ask that it be on terms that they could open an escrow account to be managed by the arbitration, and both parties be signatories to each and pay while the issues are being resolved 50 percent of -- on every shipment into the escrow account.[36]

104. It was also agreed by the Government that the ICC could administer the escrow account.[37] The Government also insisted that permission to make any shipment would be contingent on a simultaneous payment into the escrow account by SL Mining.[38]

105. SL Mining for its part agreed to these aspects of the escrow arrangement save for the appropriate amount to be paid into escrow.

106. In calculating an appropriate amount for SL Mining to pay into an escrow account for each shipment, the Emergency Arbitrator relies upon the Government's submission during these proceedings in which an assessment of the Government's alleged loss was made:

> MR. KANU: […] I'll just take you briefly to the three shipments have done. The first shipment done by MV Cooper, we believe that SL Mining and (inaudible) value on which the royalty (inaudible). Just for that shipment, we believe the Government of Sierra Leone slightly above around $60,000. And based on the three shipments you've done and -- and the calculations that we've looked in accordance with our law, we believe that we're losing over $100,000.
>
> MR. DOUGLAS: So for the three shipments in total, you believe that you've lost 100,000.
>
> MR. KANU: Yes, over -- over that.[39]

---

[36]     Transcript (Conference Call of 29 August 2019 at 10:00 London time) P31 (Mangella).
[37]     Transcript (Conference Call of 29 August 2019 at 10:00 London time) P33 (Mangella).
[38]     Transcript (Conference Call of 29 August 2019 at 10:00 London time) P48, P53 (Mangella).
[39]     Transcript (Conference Call of 30 August 2019 at 12:00 London time) P4 (Kanu/Douglas).

107.   It is thus the Government's position that it was entitled to receive approximately USD 100,000 in addition to the amounts that it did receive for the first three shipments made by SL Mining, which represents approximately USD 33,000 per shipment.   SL Mining ultimately agreed to pay that amount into escrow.[40]

108.   The Government's alleged entitlement to additional amounts of royalties for future shipments made can therefore be protected by requiring SL Mining to pay USD 33,000 into an escrow account before each shipment is made pending final resolution of this dispute by the tribunal to be constituted pursuant to Article 6.9 of the Agreement.

109.   The Emergency Arbitrator is also satisfied that SL Mining's Application is urgent because there is a serious risk that the irreparable harm will occur before the arbitral tribunal constituted pursuant to Article 6.9 of the Agreement will be in a position to rule upon an application for interim relief.   On SL Mining's case, the decision to put the Marampa Mine into care and maintenance, with the deleterious consequences that would entail, will need to be made on 7-8 September 2019 or shortly thereafter.   On the Government's case, that decision might be able to be deferred for two or possibly four weeks depending on the availability of further capacity for stockpiling the iron ore concentrate.   On either case this Application is urgent.     The fact that the Government has failed to comply with the Emergency Arbitrator's Interim Order is a further factor that increases the likelihood that the irreparable harm will occur.

**F5     Conclusions on the emergency measures to be adopted**

110.   The requirements for an order of emergency measures are satisfied. The Emergency Arbitrator will order emergency measures designed to ensure that the Temporary Suspension Order is lifted so that exports can resume from the Marampa Mine subject to the protection of the Government's alleged rights through the payment by SL Mining of an amount approximating the additional royalties for each shipment claimed by the Government into an escrow account.   The Emergency Arbitrator will not, therefore, simply accede to the relief as formulated by SL Mining in its Application but fashion emergency measures that he considers to be more appropriate considering the balance of convenience as set out above.   The Applicant has left this possibility open by including, in paragraph 72.7 of its Application, a request that the Emergency Arbitrator "*order any other relief that the*

---

[40]     Transcript (Conference Call of 30 August 2019 at 12:00 London time) P18 (Savage).

*Emergency Arbitrator deems just and proper*".

111. The Emergency Arbitrator will further order that both Parties refrain from taking any steps to aggravate the dispute and comply with their obligation in Article 6.9(d) of the Agreement, which reads:

> d) In the event of any notified dispute hereunder, both parties agree to continue to perform their respective obligations hereunder until the dispute has been resolved in the manner described above.

112. A dispute was notified by SL Mining's counsel to the Director of Mines of the National Minerals Agency of the Republic of Sierra Leone on 14 July 2019.[41]

113. During the course of the proceedings, the Applicant supplemented its request for relief by petitioning for the payment by the Government of a penalty of USD 50,000 for each day it was in default in relation to the Emergency Arbitrator's Interim Order.[42]  There is no doubt that the Government has failed to comply with the Interim Order from its date of issuance (30 August 2019) until the date of this Order.  The Emergency Arbitrator considers, nonetheless, that it would be preferable for the arbitral tribunal to be constituted pursuant to Article 6.9 of the Agreement to determine any losses occasioned by the Government's failure to adhere to the Interim Order and/or its other obligations under the Agreement in the course of those proceedings, rather than imposing a penalty for non-compliance at this stage.

114. A final matter is the status of the Interim Order following the issuance of the present Order. The present Order covers the same ground in substance as the Interim Order in relation to lifting the prohibition on shipping and therefore this Order will replace the Interim Order upon its issuance.  This is without prejudice, however, to any claims that may be raised against the Government for failing to comply with the Interim Order from 30 August 2019 to 8 September 2019.

## G   COSTS

115. There is no provision in Article 6.9 of the Agreement or otherwise dealing with costs relating to emergency arbitrator proceedings.  Article 7(3) of Annex V of the ICC Rules provides

---

[41]     Exhibit C-16.
[42]     SL Mining's Email, 5 September 2019 (17:43).

that:

> The emergency arbitrator's Order shall fix the costs of the emergency
> arbitrator proceedings and decide which of the parties shall bear them or
> in what proportion they shall be borne by the parties.

116. In exercising the broad discretion under Article 7(3) of Annex V in relation to costs, the Emergency Arbitrator can be guided by Article 38(5) of the ICC Rules, which deals with the power of an arbitral tribunal to award costs:

> 5  In making decisions as to costs, the arbitral tribunal may take into
> account such circumstances as it considers relevant, including the extent
> to which each party has conducted the arbitration in an expeditious and
> cost-effective manner.

117. SL Mining has been successful in its Application for emergency measures both in respect of its request for an Interim Order and this Order.  The general principle should be that costs follow the event and thus SL Mining is entitled to be reimbursed for its reasonable costs.

118. SL Mining claims USD 432,928.90 for its counsel's fees, USD 3,556.90 in costs and expenses (largely relating to expenses incurred in organising the transcription of conference calls and the hearing) and USD 40,000 for the Emergency Arbitrator's and the ICC's fees and expenses.

119. The Government shall pay SL Mining's costs and expenses (USD 3,556.90) and the Emergency Arbitrator's and the ICC's fees and expenses (USD 40,000) in full.  In relation to SL Mining's counsel's fees, the Emergency Arbitrator has not been provided with a narrative as to how these fees have been incurred in order to make an assessment of their reasonableness. In particular, the Emergency Arbitrator cannot determine whether any portion of SL Mining's counsel's fees were related to the preparation of the Request for Arbitration, which was filed in the course of these emergency arbitrator proceedings but would be a cost attributable to the arbitration proceedings and not the present proceedings. The amount of SL Mining's counsel's fees are higher than the Government's claimed legal fees (which are USD 270,000), but that would be expected given that SL Mining had carriage of the Application.  The Emergency Arbitrator has resolved, in exercising his broad discretion, to order the Government to pay a portion of SL Mining's counsel's fees in the amount of USD 250,000.  The Emergency Arbitrator declines to order the payment of interest on any of these amounts, as requested by SL Mining, as the relevant period of time is relatively.

## H   ORDER

120.  For the reasons set out above, the Emergency Arbitrator, having heard from the Parties, hereby issues the following Order:

120.1. The Emergency Arbitrator has jurisdiction to issue this Order and the Application is admissible;

120.2. The Government of Sierra Leone shall lift the prohibition on shipping introduced in the "Temporary Suspension Order of Mineral Rights – ML 01/2017" issued by the Minister of Mines and Mineral Resources on 3 July 2019 and reaffirmed on 24 July 2019;

120.3. SL Mining will pay the amount of USD 33,000 for each of shipment made after this Order into an escrow account opened and administered by the Secretariat of the ICC in Paris;

120.4. The Emergency Arbitrator will exercise authority over the administration of the funds held in the escrow account until such time as an arbitral tribunal is constituted under Article 6.9 of the Agreement.  Authority over the administration of the funds will be transferred to the arbitral tribunal upon the Emergency Arbitrator's receipt of a written request from the arbitral tribunal after its constitution;

120.5. The escrow arrangements stipulated in this Order will terminate either (i) when the arbitral tribunal constituted under Article 6.9 of the Agreement has finally disposed of the Parties' claims and counterclaims and the funds held in the escrow account have been distributed in accordance with the directions of the arbitral tribunal or (ii) by mutual agreement of the Parties or (iii) otherwise by order of the Emergency Arbitrator or the arbitral tribunal constituted under Article 6.9.

121.  The following steps shall be taken by the Parties to implement this Order:

121.1. The Government of Sierra Leone shall confirm by an official communication to SL Mining and the Emergency Arbitrator that the prohibition on shipping has been lifted **within two days of the issuance of this Order**.

121.2. Upon receipt of the Government's official communication referred to above, the Emergency Arbitrator will request the Secretariat of the ICC to open an escrow

account.  The details of that account will be transmitted to the Parties as soon as possible by the Emergency Arbitrator.

121.3. SL Mining shall pay USD 33,000 into the escrow account upon SL Mining's receipt of a nomination of a vessel by the buyer under the FOB contract entered into by SL Mining for each shipment it makes following this Order;

121.4. In discharging its obligation in the preceding paragraph, SL Mining will provide a copy of the document recording the nomination of the vessel and proof of the transfer of funds to the escrow account to the Government of Sierra Leone and the Emergency Arbitrator within 24 hours of SL Mining's receipt of the nomination.

122.  Both Parties are ordered to comply with Article 6.9(d) of the Agreement and thus "*continue to perform their respective obligations hereunder until the dispute has been resolved*" by the arbitral tribunal to be constituted pursuant to Article 6.9 of the Agreement;

123.  Both Parties are ordered not to take any steps to aggravate the dispute between them pending final resolution by the arbitral tribunal to be constituted pursuant to Article 6.9 of the Agreement;

124.  The Government shall pay the Emergency Arbitrator's and the ICC's fees and expenses in the total amount of USD 40,000;

125.  The Government shall pay SL Mining's legal costs and expenses incurred in relation to these emergency arbitrator proceedings in the total amount of USD 253,556.90;

126.  The Interim Order issued by the Emergency Arbitrator on 30 August 2019 is hereby replaced by the present Order without prejudice to any future claims for prejudice caused by the Government's failure to comply with the Interim Order;

127.  This Order is enforceable immediately without the necessity for either Party to have recourse to any national court or other forum.  In accordance with Article 29(2) of the ICC Rules: "*The parties undertake to comply with any order made by the emergency arbitrator.*"  That undertaking is binding on both Parties on the basis of their agreement to incorporate it into their contractual relationship by virtue of Article 6.9(c) of the Agreement;

128.  All other requests for relief are denied.

Place and seat of arbitration: London, United Kingdom


Date: 8 September 2019


Professor Zachary Douglas QC